Henry W. Lengyel, J.
This is an action for pecuniary-damages allegedly -sustained by the next of kin of Solomon Katz, deceased. The claim was duly filed and it has not been assigned.
Mr. Katz was admitted to the New York -State Psychiatric Institute on June 26, 1962. Prior to this admission he had a history of physical pain and suffering, operations for physical ailments and mental depressions brought on apparently because of his deteriorating physical condition. His physical and mental problems started in 1959 when he entered Flower and Fifth Avenue Hospital for removal of a polyp from the colon. He was in several hospitals after the initial admission in 1959 and, in fact, was a patient at the Psychiatric Institute from May 16, 1961 through June 19, 1961, when he was discharged as “ Conversion Hysteria, Psychoneurosis Improved ”. For about two months after June 19, 1961, he was in an improved mental condition but then reverted to a depressed mood in which he cried and spoke of committing suicide. Finally, as above stated, he was readmitted to the Psychiatric Institute. At the time of the second admission he was diagnosed psychoneurosis reactive depression. The doctors in the hospital -were aware of Mr. Katz’ physical and mental problems particularly' his suicidal ideation. The hospital record indicates that Mr. Katz’ wife had informed the medical staff that the patient had allegedly attempted suicide by trying to jump out of the window at his home and also by hoarding pills with the intent of taking -same for suicidal effect. However, it was their medical judgment that he was not a suicidal risk. If he had been considered a suicidal risk he would have been placed either on a closed ward for very suicidal patients; or, if not on the closed ward, then an attendant would have been within an arm’s length of him at all times. As Mr. Katz was not considered a suicidal risk he was placed on a semi-open ward. There were 28 patients on the ward and 4 hospital personnel. It was possible to leave this ward, Ward 7, by elevator, which Mr. Katz did on July.8, 1962. He proceeded from the hospital to the subway at 168th Street and Broadway in New York City where he jumped in front of a subway train and was killed.
The question basic to our consideration of this case is whether the -State applied a qualified medical judgment to this patient *63 and exercised a degree of care which, under all the facts presented, was reasonable to protect the patient from the consequences of his own acts.
Claimant’s counsel takes the position that the recent case of Muhlmichl v. State of New York (20 A D 2d 837) should be controlling on our consideration of the instant case. In that case the patient was voluntarily admitted to a State hospital following a series of mental disorders and several attempts to commit suicide. Some 16 days after admission the patient escaped and a short time later he committed suicide by crawling under a bus. The Attorney-General, on the appeal, conceded “ that the decedent had exhibited suicidal tendencies and that his ‘ elopement ’ from the Brooklyn State Hospital was made possible because of the inadequate supervision by the hospital ’ ’. The Appellate Division made an additional finding that this patient’s death was “ the result of a suicidal act, the State having such notice of such suicidal propensities.”
It is our opinion that the facts presented to us in the subject case do not fall within the scope of Muhlmichl v. State of New York (supra). In this case, Mr. Katz was placed on a ward with only 27 other patients and there were 4 hospital personnel in attendance on the ward at the time of the escape. This is an impressive ratio of attendants to patients when one considers the situation prevalent in other State mental hospitals. No evidence was presented at the trial which indicated inadequate supervision, particularly when we consider the medical diagnosis. In subject case, the medical psychiatric staff had made a reasoned medical appraisal of Mr. Katz and it was their opinion that he was not a patient with suicidal tendencies; or, a suicidal risk (cf. Lawrence v. State of New York, 44 Misc 2d 756). The staff doctors also did not consider that taking Mr. Katz off perocodan, a drug to which he had become habituated, would lead to any suicidal risk.
We believe the subject case falls within the rules set forth in St. George v. State of New York (283 App. Div. 245). As in that ease there is no suggestion here that the staff doctors who treated and considered Mr. Katz were unqualified or incompetent. In fact, claimant’s expert admitted they were qualified doctors and were entitled to their medical opinions. As was stated in Si. George v. State of New York (supra, p. 248) “ Are the doctors, or is the State which employs them, legally responsible in damages for an honest error of professional judgment made by qualified and competent persons ? We think this question must be answered in the negative. It has been so held in malpractice cases of all types for years. * * * Future *64 human behavior is unpredictable, and it would place an unreasonable and unfair burden upon the State if it were to be held responsible in damages for everything that a person does after he has been discharged or released from one of its State institutions, even though the release [escape] was through an error of judgment, unless there is something more present than is contained in this record.” (Material in brackets added by this writer.) See, also, Taig v. State of New York (19 A D 2d 182, 183) “ This is one of the medical and public risks which must be taken on balance, even though it may sometimes result in injury to the patient or others.” We find that said decedent was given adequate care and supervision while at the Psychiatric Institute. We also find that he was diagnosed and treated by qualified, skilled and competent doctors, following recognized and standard procedures for diagnosis and treatment. Admittedly, the fact that this patient apparently committed suicide indicates an error in medical judgment; but not such an error under the facts presented as to cause us to find liability against the State of New York. If we were to find otherwise we would in effect be rewriting the doctrine enunciated in Palsgraf v. Long Is. R. R. Co. (248 N. Y. 339, 344) to read: “ The risk reasonably to be perceived [in retrospect] defines the duty to be obeyed ”.
We reserved decision upon the State’s motions to dismiss made at the end of claimant’s case and at the end of the trial. We now grant such motions and the claim is dismissed.